UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **TAWANA SMITH,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:23-cv-01467-MHH |
| **THE ARC OF CENTRAL ALABAMA,** | } |
| **Defendant.** | } |

# MEMORANDUM OPINION AND ORDER

Plaintiff Tawana Smith has sued her former employer, The Arc of Central Alabama, for alleged violations of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, and the Family and Medical Leave Act. (Doc. 10, pp. 12–22, ¶¶ 86–145). Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Arc has moved to dismiss Ms. Smith's failure to accommodate claim under the ADA and her FMLA claims under Counts II, IV, and V of her amended complaint. (Doc. 15; Doc. 10, pp. 14–16, 17–21 ¶¶ 96–107, 117–43). This opinion resolves the Arc's motion.

I.

Under Rule 12(b)(6), a defendant may move to dismiss claims for which relief is not available under the law. FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a Rule 12(b)(6) motion to dismiss, district courts must "view the allegations of the complaint in the light most favorable to the plaintiff, accept as true the well-pleaded allegations, and draw all reasonable inferences in the plaintiff's favor." *McCarthy v. City of Cordele*, 111 F.4th 1141, 1145 (11th Cir. 2024) (citations omitted).[1]

II.

Accepting her factual allegations as true, Ms. Smith suffers from an autoimmune condition known as Graves Disease. Symptoms of Graves Disease and related hyperthyroidism include fatigue, rapid heart rate, irregular heartbeat, irritability and anxiety, frequent bowel movements, trouble sleeping, weight loss, sensitivity to temperature, and various problems with one's eyes. (Doc. 10, pp. 3–4, ¶ 15).

---

[1] Because the Arc seeks dismissal of only Counts II, IV, and V, the Court includes in this opinion only factual allegations relevant to the claims in those counts.

The Arc serves individuals with intellectual and developmental disabilities. (Doc. 10, p. 4, ¶ 17). When the Arc hired Ms. Smith in August of 2021 as a Quality Disability Specialist, she notified the Arc that she has Graves Disease. (Doc. 10, p. 4, ¶¶ 16, 18).[2] In November 2022, Ms. Smith received a new title and a new supervisor. (Doc. 10, p. 6, ¶ 32). In March 2023, Ms. Smith's supervisor indicated that she wanted Ms. Smith to adjust the way she completed progress reports. (Doc. 10, pp. 6-7, ¶¶ 39-40). On March 6. 2023, Ms. Smith's supervisor sent Ms. Smith information about the new procedures for progress reports. (Doc. 10, p. 7, ¶ 43).

The following day, Ms. Smith "worked on the progress notes as instructed." (Doc. 10, p. 7, ¶ 44). After work that day, her thyroid "went into hyperthyroidism causing her high blood pressure and a high heart rate." (Doc. 10, p. 7, ¶ 45). Early the next morning, Ms. Smith notified her supervisor "of the hyperthyroidism, high blood pressure and a high heart rate," and went to the emergency room. (Doc. 10, p. 7, ¶ 46). Later that day, Ms. Smith "requested leave from work as a reasonable accommodation until her symptoms improved and she was cleared by her doctor to return to work." (Doc. 10, p. 8, ¶ 47). Ms. Smith's supervisor told her to submit an "ER work excuse." (Doc. 10, p. 8, ¶ 48). Though she was qualified, no one notified

---

[2] In her EEOC charge, Ms. Smith asserted that she notified the Arc of her disability in November 2022. (Doc. 10-1, p. 1).

Ms. Smith that she was eligible for FMLA coverage while she was on leave. (Doc. 10, p. 8, ¶¶ 49, 51).

While Ms. Smith was hospitalized, her supervisor "kept calling [her] asking her to complete paperwork that was already turned in." (Doc. 10, p. 8, ¶ 52). The hospital discharged Ms. Smith on March 8, 2023, but readmitted her a short time later. (Doc. 10, p. 8, ¶ 53). The hospital discharged her again on March 11, 2023, with "a no work restriction [because] she had significant tremors." (Doc. 10, p. 8, ¶¶ 53–54).

Because Ms. Smith felt pressure to return to work, on March 13, 2023, she told her supervisor that she could return to work the following day. (Doc. 10, p. 9, ¶ 56). Ms. Smith explained that she continued to experience "symptoms of extreme faint, walking pain, rapid heart rate, and shortness of breath" and pain to the touch. (Doc. 10, p. 9, ¶ 57). Ms. Smith's supervisor acknowledged these symptoms and requested a doctor's note explaining Ms. Smith's absence from work. (Doc. 10, p. 9, ¶ 58).

On March 14, 2023, when Ms. Smith arrived at work, she gave her supervisor a doctor's note that indicated that Ms. Smith could return to work on March 17, 2023. (Doc. 10, p. 9, ¶ 59). The supervisor sent her home, (Doc. 10, p. 9, ¶ 60), but later that day asked Ms. Smith by email to complete the February progress notes before Thursday, March 16, 2023. (Doc. 10, p. 9, ¶ 61). Ms. Smith alleges that

4

between March 8, 2023 and March 17, 2023, the Arc "refused to allow [her] to take leave by continuously badgering her to complete work and to return to work before [her] doctor released her to return." (Doc. 10, p. 9, ¶ 62). Ms. Smith completed the paperwork. (Doc. 10, pp. 9, 11, ¶¶ 63, 81–83).

The Arc terminated Ms. Smith's employment on March 22, 2023. (Doc. 10, p. 11, ¶ 76). The person who notified Ms. Smith of her termination told her that the termination was in her best interest. (Doc. 10, p. 11, ¶ 77). When Ms. Smith asked for the "real reason" for her termination, the Arc stated that "she did not turn in a male subordinate's paperwork." (Doc. 10, p. 11, ¶ 79). Ms. Smith asserts that the articulated reason for her termination is false. (Doc. 10, p. 11, ¶ 79).

On July 20, 2023, Ms. Smith filed a charge of discrimination with the Equal Employment Opportunity Commission. (Doc. 10-1, p. 2). Ms. Smith alleged that she "[is] a member of a protected group (disabled, female, engaged in protected activity)." (Doc. 10-1, p. 1). She stated that during her employment with Arc, she was "subjected to both pervasive harassment as well as retaliation for engaging in protected activity." (Doc. 10-1, p. 1). She asserted that after she notified her employer of a qualified disability in November 2022, her supervisor at the time began discriminating against her, and she complained to HR. (Doc. 10-1, p. 1). She wrote that, "[s]ubsequent to that report of harassment," she was transferred to a new position under a new supervisor. (Doc. 10-1, p. 1). Ms. Smith stated that her new

supervisor would not allow her to discipline a male subordinate employee who would not complete his paperwork and that she was terminated "for not submitting [the male subordinate's] paperwork." (Doc. 10-1, p. 2). Ms. Smith wrote that she was discriminated against because she is female in violation of Title VII, and she was retaliated against because she engaged in protected activity. She indicated that she wanted to pursue retaliation claims under the ADA and under Title VII. (Doc. 10-1, p. 2).

### III.

The Arc argues that the Court should dismiss Ms. Smith's ADA failure to accommodate claim because Ms. Smith did not exhaust her administrative remedies before asserting the claim in her complaint in this action. (Doc. 15, pp. 7–12; *see* Doc. 10, pp. 14-15). "The ADA prohibits employers from discriminating against 'a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018) (quoting 42 U.S.C. § 12112(a)). "One way a plaintiff may establish" that she "was subjected to unlawful discrimination because of her disability" is to demonstrate "that her employer failed to provide her with a reasonable accommodation for her disability." *Batson*, 897 F.3d at 1326 (citation omitted). "An employee making a discrimination claim under

6

the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination with the EEOC." *Batson*, 897 F.3d at 1327 (citation omitted).

The exhaustion requirement gives the EEOC "the 'first opportunity to investigate the alleged discriminatory practices [and] perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Batson*, 897 F.3d at 1327 (brackets in *Batson*) (quoting *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)). When an individual files an EEOC charge and receives a permission to sue letter from the EEOC, the individual may include in a judicial complaint claims that "amplify, clarify, or more clearly focus the allegations in the EEOC complaint," but a plaintiff may not assert a claim for "new," unexhausted "acts of discrimination." *Batson*, 897 F.3d at 1327 (internal quotation marks omitted) (quoting *Gregory*, 355 F.3d at 1279–80). Because the Eleventh Circuit is "'extremely reluctant to allow procedural technicalities to bar [ADA] claims," the Eleventh Circuit has "noted that 'the scope of an EEOC complaint should not be strictly interpreted.'" *Batson*, 897 F.3d at 1327 (quoting *Gregory*, 355 F.3d at 1280).

"To determine whether a plaintiff has exhausted her administrative remedies, then, the 'proper inquiry' is whether the '[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge.'" *Batson*, 897 F.3d at 1328 (brackets in *Batson*) (quoting *Gregory*, 355 F.3d at 1280). A plaintiff

7

has exhausted her administrative remedies with respect to an ADA discrimination claim when the EEOC's investigation of other claims "would have reasonably uncovered any evidence of" an employer's failure to accommodate. *See Batson*, 897 F.3d at 1327–28 (internal quotation marks omitted) (quoting *Gregory*, 355 F.3d at 1278) (applying principle in context of retaliation claim). For example, the Eleventh Circuit has held that a plaintiff could pursue a Title VII claim for retaliation even though the plaintiff exhausted only Title VII claims for discriminatory termination based on her race and sex because the "facts alleged in [the plaintiff's] EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination." *Gregory*, 355 F.3d at 1280. Like Ms. Smith, Ms. Gregory prepared her EEOC charge without the help of an attorney. 355 F.3d at 1280.

In its unpublished decision in *Booth v. City of Roswell*, the Eleventh Circuit affirmed a district court's dismissal of an ADA failure-to-accommodate claim because the plaintiff did not exhaust the claim. 754 Fed. Appx. 834, 837 (11th Cir. 2018). In his EEOC charge, Mr. Booth stated only that he "was terminated and that he believed he had been discriminated against because of his disability;" he "did not relay what his disability was, nor mention an accommodation request" or "a failure to accommodate." *Booth*, 754 Fed. Appx. at 837. The Eleventh Circuit noted that the instances of discrimination that Mr. Booth described in his EEOC charge

8

occurred approximately six months after he allegedly requested an accommodation. *Booth*, 754 Fed. Appx. at 837. On this record, the Eleventh Circuit concluded that Mr. Booth's failure-to-accommodate claim "describe[d] new acts of discrimination, and as a result, the district court did not plainly err in dismissing [the failure-to-accommodate claim] for lack of exhaustion." *Booth*, 754 Fed. Appx. at 837 (underline in *Booth*).[3]

Here, as in *Gregory*, the question is whether the facts in Ms. Smith's EEOC charge "could have reasonably been extended to encompass" an ADA failure to accommodate claim because the facts relating to her failure to accommodate claim "were inextricably intertwined with her complaints of" Title VII gender discrimination and ADA and Title VII retaliation. *Gregory*, 355 F.3d at 1280. "That is," did Ms. Smith "state[] facts from which a reasonable EEOC investigator could have concluded that what she had complained about is" a failure to accommodate under the ADA. *Gregory*, 355 F.3d at 1280.

Here, the answer to that question is no. Giving Ms. Smith's *pro se* EEOC charge a liberal reading, there are no facts in the charge that would lead an EEOC investigator to examine whether the Arc offered Ms. Smith an ADA accommodation when her Graves Disease flared in late March 2023. The facts in the EEOC charge

---

[3] The Eleventh Circuit reviewed the dismissal of Mr. Booth's failure to accommodate claim for plain error because a magistrate judge had recommended dismissal of the claim, and Mr. Booth did not object to the recommendation. *Booth*, 754 Fed. Appx. at 836-37.

9

relating to her disability concern discrimination and harassment that she allegedly experienced under one supervisor. (Doc. 10-1, p. 1). The facts in the EEOC charge concerning the timeframe in which she now alleges that she needed an ADA accommodation concern gender discrimination for which a different supervisor allegedly was responsible. (Doc. 10-1, p. 2). Like Mr. Booth, Ms. Smith "did not relay [in her EEOC charge] what h[er] disability was, nor mention an accommodation request" or "a failure to accommodate." *Booth*, 754 Fed. Appx. at 837. The failure to accommodate that she alleges in her complaint occurred in March 2023 under her second supervisor; the ADA discrimination that she describes in her EEOC charge occurred earlier under her first supervisor. On this record, Ms. Smith did not exhaust her ADA failure to accommodate claim, so the Court will dismiss that claim.

The Arc next argues that Ms. Smith did not allege her FMLA interference and retaliation claims properly because Ms. Smith did not request FMLA leave and suffered no prejudice from alleged purported interference. (Doc. 15, pp. 13–21; Doc. 19, pp. 7–11). The FMLA, among other benefits, enables certain employees to request up to 12 weeks of unpaid leave per year to deal with certain "serious health conditions." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits an employer from "interfere[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" an employee's right to leave. 29 U.S.C. § 2615(a)(1). The FMLA also

prohibits employers from retaliating against employees for "opposing any practice made unlawful by" the FMLA.  29 U.S.C. § 2615(a)(2).

"[T]o state a claim for interference or retaliation" under the FMLA, "the plaintiff must have been eligible for the leave that she sought." *Martin v. Fin. Mgmt. Sys., Inc.*, 959 F.3d 1048, 1052 (11th Cir. 2020) (citation omitted).  "The critical question" district courts "must consider asks whether the 'employee adequately conveyed to the employer sufficient information to put the employer on notice that her absence was potentially FMLA-qualifying.'" *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1242 (11th Cir. 2021) (quotation omitted).  "[A]n employee seeking FMLA leave for the first time need not 'expressly assert rights under the [FMLA] or even mention the FMLA to meet . . . her obligation to provide notice.'" *Ramji*, 992 F.3d at 1243 (brackets added and in *Ramji*) (quotations omitted).  "Rather, notice must simply allow the employer to understand that the employee potentially qualifies for FMLA rights." *Ramji*, 992 F.3d at 1243.

FMLA regulations provide examples of sufficient notice.  These examples include notice "that a condition renders the employee unable to perform the functions of the job; that the employee is pregnant or has been hospitalized overnight;" and notice that "the employee or the employee's family member is under the continuing care of a health care provider." 29 C.F.R. § 825.303(b).  "Calling in

11

'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the" FMLA. § 825.303(b).

Ms. Smith alleges more than a sick call—she alleges that she informed her supervisor on March 8, 2023 that she had experienced "hyperthyroidism, high blood pressure and a high heart rate," that she had had to go to the emergency room, and that she "would not be at work." (Doc. 10, p. 7, ¶ 46); *see* § 825.303(b). Ms. Smith alleges that her employer instructed her to get an "ER work excuse." (Doc. 10, p. 7, ¶ 47). Ms. Smith also alleges that on March 14, 2023, she provided to her supervisor a note in which her doctor stated that she would be released to work on March 17, 2023. (Doc. 10, p. 9, ¶ 57). Ms. Smith alleges that she told her supervisor that she "was still not feeling well," and her supervisor sent her home. (Doc. 10, p. 9, ¶¶ 57-58). Accepting these allegations as true at this stage of the litigation, Ms. Smith notified her supervisor at the Arc that she (Ms. Smith) had been hospitalized and was "under the continuing care of a health care provider." *See* § 825.303(b). It does not matter that Ms. Smith did not request FMLA leave formally under these circumstances. *See Ramji*, 992 F.3d at 1243 (citations omitted). Therefore, Ms. Smith has alleged sufficiently that she requested leave.

The Arc points out correctly that "a plaintiff suffers no FMLA injury when she receives all the leave she requests." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999) (per curiam). Ms. Smith alleges that her supervisor

12

at the Arc sent her home, given her physician's return to work date, but she also asserts that the Arc pressured her to work from home during her leave and to return to work before she could do so safely. (*See* Doc. 10, pp. 8–9, ¶¶ 47–63; Doc. 18, p. 16). The Court has not found a published Eleventh Circuit decision that addresses this scenario, but the "general consensus among courts is that *reasonable contact* limited to inquiries about the location of files or passing along institutional or status knowledge will not interfere with an employee's FMLA rights; however, asking or requiring an employee to perform work while on leave can constitute interference." *Simmons v. Indian Rivers Mental Health Ctr.*, No. 7:08-cv-1035-SLB, 2015 WL 13725503, at *3 (N.D. Ala. Mar. 31, 2015) (italics omitted).

For example, in *Arban v. West Publishing Corp.*, 345 F.3d 390 (6th Cir. 2003), the Sixth Circuit affirmed a jury finding of an FMLA violation where the plaintiff "presented evidence that he was asked to continue to perform work-related tasks while ostensibly on medical leave." 345 F.3d at 402–03. In *Sabourin v. University of Utah*, 676 F.3d 950 (10th Cir. 2012), the Tenth Circuit found that an employer did not interfere with an employee's leave by asking the employee to provide documents while on leave, after the employee took the documents home before the leave began. *Sabourin*, 676 F.3d at 960–61.

Based on this authority, Ms. Smith's allegations concerning work requests during her leave of absence suffice to support an FMLA interference claim. Ms.

13

Smith alleges that her supervisor at the Arc "refused to allow [her] to take leave by continuously badgering her to complete work and to return to work before [her] doctor released her to return." (Doc. 10, pp. 8, 9, ¶¶ 52, 61–62). Therefore, the Court will not dismiss Ms. Smith's FMLA interference and retaliation claims.

### IV.

Accordingly, the Court grants the Arc's motion to dismiss Count II and denies the Arc's motion to dismiss Counts IV and V of Ms. Smith's amended complaint. Because, under the FMLA, an "employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion," Ms. Smith may pursue only "compensation and benefits lost," "monetary losses sustained," and "equitable relief" under her FMLA claims. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (quotations omitted).

The Clerk shall please TERM Doc. 15.

**DONE** and **ORDERED** this March 21, 2025.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE